# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-1288


**STATE OF LOUISIANA**

**VERSUS**

**MOSES BUCHANAN**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 06-K-4526-A
HONORABLE JAMES PAUL DOHERTY, JR., DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


## SHANNON J. GREMILLION
## JUDGE

**\*\*\*\*\*\*\*\*\*\***


Court composed of Oswald A. Decuir, James T. Genovese, and Shannon J. Gremillion, Judges.


**AFFIRMED.**


**Paula Corley Marx**
**Louisiana Appellate Project**
**P. O. Box 80006**
**Lafayette, LA 70598-0006**
**(337) 991-9757**
**Counsel for Defendant/Appellant:**
**Moses Buchanan**

**Earl B. Taylor**
**District Attorney, 27th Judicial District Court**
**P. O. Drawer 1968**
**Opelousas, LA 70571-1968**
**(337) 948-3041**
**Counsel for Appellee:**
**State of Louisiana**

**Jennifer Ardoin**
**Assistant District Attorney, 27th Judicial District Court**
**P. O. Drawer 1968**
**Opelousas, LA 70571-1968**
**(337) 948-0551**
**Counsel for Appellee:**
**State of Louisiana**

**GREMILLION, Judge.**

Following a jury trial, Defendant, Moses Buchanan, was convicted of armed robbery, a violation of La.R.S. 14:64. He was sentenced to serve forty years at hard labor. Defendant is now before this court on appeal, challenging both his conviction and sentence. We affirm.

## FACTS

On the evening of August 26, 2006, a man entered Kiki's Drive-Thru Daiquiri Shop in Opelousas, Louisiana, holding his crotch, and requesting to use the restroom. Wanda Robin was working behind the bar and her son, Ryan Robin, her niece, Lindsey Johnson, and Justin Fontenot were sitting at the bar having drinks. The man was directed to the restroom and departed the bar soon thereafter. About fifteen to twenty minutes later, the man returned to the bar with a shotgun, pointed the gun at everyone, and yelled at them to get down. He then pointed the gun at Wanda and instructed her to open the register. After Wanda handed over the cash from the register, the robber instructed everyone not to move or they would die, and he fled the bar. Following a brief investigation, Defendant was arrested on August 29, 2006, and charged with armed robbery.

## SUFFICIENCY OF THE EVIDENCE

The analysis for a claim of insufficient evidence is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations

1

of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

Defendant was found guilty of armed robbery, which is defined in La.R.S. 14:64 as "[t]he taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." On appeal, Defendant contends that the State did not connect him with the crime or identify him as the perpetrator beyond a reasonable doubt. Further, Defendant asserts that the State was required to negate any reasonable probability of misidentification, citing *State v. Draughn*, 05-1825 (La. 1/17/07), 950 So.2d 583, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007). Lastly, Defendant also maintains that the totality of the circumstances must be considered pursuant to *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375 (1972) and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977). Considering same, Defendant contends that the State failed to negate the reasonable probability of misidentification.

A review of the record does not support Defendant's contentions. First, three of the four eyewitnesses present during the robbery identified the perpetrator from a photo line-up. Wanda, Ryan, and Justin all identified the man in photograph number two, Defendant, to be the person who robbed the bar. At trial, all three individuals identified Defendant as the person who committed the offense. Lindsey, the remaining eyewitness, testified that she was not able to identify the robber in the photo line-up, but was certain of her identification of Defendant in open court to be the person who robbed the bar.

2

Defendant maintains, nonetheless, that several facts exist which led to his misidentification as the perpetrator. First, Defendant maintains that the atmosphere was very charged during the robbery, and, in turn, affected the reliability of the witnesses' identifications. Specifically, Defendant asserts that Wanda was hysterical during the robbery, that Lindsey passed out after the robbery, and that Justin was in shock.

The record reflects little doubt that the atmosphere during the robbery was highly charged. The perpetrator pointed a shotgun at everyone in the bar and threatened to harm them if they did not comply with his demands. The record indicates that Wanda was very emotional during and after the offense. According to Wanda, the perpetrator pointed the gun at her and said, "Bitch, I'm gonna kill you." At that moment, Wanda attempted to run away, but was stopped by the robber. When her son, Ryan, urged her to give the man the money, she removed the money from the register after having difficulty opening the register and handed the money to the robber.

Ryan testified that Wanda was "hysterical." According to Ryan, the perpetrator pointed the gun at everyone and screamed at them to get down. He then pointed the gun at Wanda, who was tending bar and instructed her to open the register. According to Ryan, Wanda panicked and tried to run away. Ryan then instructed Wanda to listen to what the man said and give him the money. After Wanda complied with his demand, the robber told everyone not to move or they would die.

Lindsey testified that when the perpetrator returned to the bar, he was holding a shotgun and cursing. He instructed them to get on the floor, and Lindsey complied. Lindsey admitted that she was frightened and stated that the man pointed the gun at

3

her. Before the man left, he instructed them not to get up. Lindsey testified that after he left, she stayed on the floor and crawled to the bathroom to call 911. On cross-examination, Lindsey's testimony indicates that she "passed out" some time after calling 911, not during the offense.

Lastly, Justin's testimony regarding the facts surrounding the offense was similar to that of Wanda, Ryan, and Lindsey. When asked if he was frightened, Justin responded, "Not at the time because I was really just in shock, I guess, but later on after he had left, yes, later on I was."

Although the record supports Defendant's contention that the atmosphere during the offense was highly charged, we find the likelihood of misidentification is unlikely.

> [R]eliability is the linchpin in determining the admissibility of identification testimony. . . . The factors to be considered . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

*Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253 (citation omitted).

Considering the *Brathwaite* factors, the record indicates that the three eyewitnesses, Ryan, Lindsey, and Justin, had two opportunities to view Defendant, while Wanda had one opportunity. Ryan, Lindsey, and Justin first saw Defendant when he entered the bar prior to the offense, holding his crotch and asking to use the restroom. All four witnesses saw Defendant the second time he entered the bar, about fifteen to twenty minutes later.

With regard to the witnesses' degree of attention, Defendant's behavior, holding his crotch, captured the attention of Ryan, Lindsey, and Justin when he first entered the bar. Additionally, Ryan and Justin both testified that there was a bell on

4

the door of the bar that would ring when a patron entered the bar, drawing one's attention to the person entering the bar. When Defendant entered the bar the second time, Ryan and Justin stated that the bell rang, and they all turned to the door to see who it was. To their surprise, Defendant had returned with a shotgun and commanded the attention of Ryan, Lindsey, and Justin by pointing the gun in their direction. According to Ryan, Defendant cursed and pointed the gun at them to get their attention. Wanda was working the drive-through window when Defendant first arrived, but was soon confronted by Defendant when she returned to the register at the bar. At that time, Defendant pointed the gun at her and said, "Bitch, I'm gonna kill you." Considering these facts, we find that the fact finder could reasonably conclude that the witnesses were paying attention to Defendant.

With regard to the accuracy of the witnesses' prior descriptions of Defendant, the record reflects that all four witnesses gave a statement to police when they arrived at the scene, each providing a description of the perpetrator. These statements, however, were not admitted into evidence, and thus, the only details in the statements discussed at trial are available on review.

At trial, Ryan recalled the description of the perpetrator he gave to officers on the night of the offense. Ryan described the perpetrator as a male, about twenty-five to thirty-five years old, five feet eight inches tall, with dark skin and shaved or closely cropped hair. Ryan also recalled that the robber wore wire-rimmed glasses. The men portrayed in the photo line-up all had dark skin, closely cropped hair, and wire-rimmed glasses. As such, the description given by Ryan prior to the photo line-up was an accurate description of Defendant.

5

Wanda, Ryan, and Justin were all certain about their identification of Defendant in the photo line-up. All four witnesses were certain about their identification of Defendant in open court. Considering same, the level of certainty demonstrated at the time of the photo line-up was significant. Additionally, only four days elapsed from the time of the crime and the time of the photo line-up, increasing the likelihood that the identification of Defendant was reliable pursuant to the *Manson* decision.

In addition to the consideration of the *Manson* factors, although Lindsey may have passed out at some time after the offense, she had the wherewithal to crawl to the bathroom and call 911. Further, Justin's testimony that he was in shock referred to his state of mind at the time of the offense. Justin indicated that he was more surprised by Defendant's actions than frightened. Without any other facts to support Defendant's claim that the ability of the eyewitnesses to identify Defendant as the perpetrator was compromised and therefore, unreliable, Defendant's argument lacks merit.

Defendant also complains that the fact that the robber was wearing glasses was not present in the statements of Wanda, Lindsey, and Ryan. At trial, Wanda testified that at the time of the offense, Defendant was wearing wire-frame glasses. With regard to her written statement taken right after the offense, Wanda stated that she did not write the statement herself, but recited it while someone else wrote it on her behalf. Wanda then signed the statement. Wanda confirmed that the statement did not say anything about Defendant wearing glasses. She maintained, however, that in fact, she did notice Defendant's glasses, but did not mention the detail in her statement.

6

Lindsey testified that the man was wearing a hunter green shirt and blue jeans. She could not recall if he was wearing glasses. On cross-examination, Lindsey indicated that she did not get a good look at Defendant when he first entered the bar to see whether or not he was wearing glasses. When he entered the second time, Lindsey testified that she was staring down a shotgun barrel and did not notice if he had glasses on his face. Lastly, Lindsey confirmed that her written statement did not indicate that Defendant was wearing glasses.

Ryan testified that at the time of the offense, Defendant wore wire-rimmed glasses, a green shirt, and pants. At trial, Ryan noted that Defendant was not wearing the same glasses at trial that he was wearing the night of the offense. On cross-examination, Ryan identified his written statement given to police after the offense and testified that he did not see anywhere in his statement that the perpetrator was wearing glasses. Ryan testified that it was a detail that must have slipped his mind when he was writing the statement. Ryan indicated that he was nervous about writing the statement and that he was focused more on the incident. Ryan maintained that it was a detail, however, that he never forgot.

Although the fact that Defendant was wearing glasses was absent from the eyewitnesses' statements, both Wanda and Ryan recalled that he was wearing wire-frame glasses. Wanda testified that she was shaken up after the offense and was in a hurry to get the statement written so she could leave the bar. According to Wanda, she "just wanted to get out of there." As such, it is plausible that Wanda would leave out details such as Defendant's glasses at the time her statement was taken. Likewise, Ryan testified that he was focused more on the offense at the time he was writing his

7

statement. Ryan stated that he was certain, however, of his recall and the fact that Defendant was wearing glasses at the time of the offense.

Next, Defendant complains that Lindsey was unable to identify him in a photo line-up, yet she was able to make an in-court identification. At trial, Lindsey testified that she was not able to identify the perpetrator in a photograph lineup following the offense. She was, however, able to identify Defendant in open court to be the man who robbed the bar. Lindsey stated that she was certain that Defendant was the perpetrator because she remembered him. When asked about the difference between her ability to identify Defendant in a photo line-up and her ability to make an in-court identification, she explained that she could identify him in person but not in a picture.

Although Defendant questions the reliability of Lindsey's identification of Defendant, the fact remains that the three remaining eyewitnesses, Ryan, Wanda, and Justin, were able to identify Defendant in both a photo line-up and in court. As such, even if the fact finder could reasonably conclude that Lindsey's identification of Defendant was unreliable, the record still supports the identity of Defendant as the perpetrator.

Lastly, Defendant complains that there was no physical evidence linking him to the crime. Defendant asserts, first, that no money was ever recovered. The Defendant also maintains that there was insufficient proof that the gun introduced at trial was the gun used during the robbery. Although Defendant's assertions are correct, physical evidence is not required for a finding of guilt. In *State v. Neal*, 00-674, p.11 (La. 6/29/01), 796 So.2d 649, 658, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002), the supreme court stated:

> As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the

8

state is required to negate any reasonable probability of misidentification. *State v. Smith*, 430 So.2d 31, 45 (La.1983); *State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221, 1227 (La.1982). However, positive identification by only one witness is sufficient to support a conviction. *See State v. Mussall*, 523 So.2d 1305, 1311 (La.1988) (generally, one witness's positive identification is sufficient to support the conviction); *State v. Ford*, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847, 849-50, *writ denied*, 99-0210 (La.5/14/99), 745 So.2d 12.

Although no money was found and a shotgun belonging to Defendant was not positively linked to the offense, the fact remains that Defendant was identified as the perpetrator by not one, but four eyewitnesses. In addition to the testimony of these eyewitnesses, the corroborating testimony of Richard Griffin placed Defendant at the scene. Richard testified that he gave Defendant and a male companion a ride to the bar around 10:00 p.m. on the evening in question. Richard stated that he parked on the side of the bar for about ten minutes until the two men returned to the vehicle. Richard also identified Defendant in court to be the man he had taken to the bar that evening.

Considering the totality of the evidence at trial, the State adequately negated the probability of misidentification in the instant case. Accordingly, the evidence was sufficient for a finding of guilt, and the jury's verdict should not be disturbed on appeal.

**OBJECTIONS NOT MADE AT THE TIME OF THE OCCURRENCE**

By assignment of error number one, Defendant argues that the trial court erred in allowing the State to effectively use his decision to exercise his right to remain silent against him in an attempt to rehabilitate Officer Roylis Gallow. By assignment of error number two, Defendant argues that his right to confrontation was denied when statements of a confidential informant or cooperative individual (CI) as to his

9

description and identity were admitted. Defendant argues it was error for the trial court to instruct the jury that an investigator need not reveal the identity of a CI and consequently deny him the opportunity to cross-examine the CI at trial. However, Defendant did not object to the State's question or Officer's Gallow's testimony. He objected neither when the statements of the CI were admitted nor when the trial court instructed the jury.

Pursuant to La.Code Crim.P. art. 841(A), "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." Without a contemporaneous objection to (1) Officer Gallow's statement at trial; (2) the admittance of the CI's statement; and (3) the trial court's jury instruction regarding the CI, Defendant is barred from raising these issues for the first time on appeal. These issues are not properly before this court and thus, the merits of these alleged errors are not considered herein.

### EXCESSIVENESS OF SENTENCE

In his final assignment of error, Defendant argues that his forty-year sentence is excessive, considering his personal history and the mitigating factors of the case. This court has set forth the following standard to be used in reviewing excessive sentence claims:

> La.Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is

10

whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

To decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has held:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

Defendant was convicted of armed robbery. The sentencing range for armed robbery is ten to ninety-nine years at hard labor, without benefit of parole, probation, or suspension of sentence. La.R.S. 14:64(B). As such, Defendant's forty-year sentence is less than half of the maximum possible sentence.

At sentencing, the trial court stated:

> The court has before it Moses Buchanan, a 42-year-old male, found guilty by a jury of the crime of armed robbery. The defendant has a history of being abandoned by both mother and father as an infant and became a ward of the State of Alabama until placed in a suitable family environment at the age of nine. He graduated from high school in Montgomery, Alabama, in 1982, and moved to New Orleans to live with a brother. From '86 to '88, the defendant was in the United States Air Force but was discharged due to disciplinary problems. He moved back

11

to New Orleans in 1988 and began using drugs and started his life of crime. His criminal record indicates at least twenty-eight arrests dating back to 1988. He has had one previous period of supervised probation and three periods of parole supervision, two of which were completed, but the third ended in revocation on November 22, 2006. The defendant is classified as a fifth felony offender and is not eligible for probation nor a suspended a [sic] sentence. He is also not eligible for the impact program because he's been convicted of a crime of violence as set forth in Revised Statute 14, Section 2. The defendant has little employment history.

The court has considered the guidelines of sentencing set forth in Code of Criminal Procedure Article 894.1, and considering the crime of armed robbery for which he was found guilty and his extensive criminal history, the three factors of paragraph A of Article 894.1 are applicable. The court finds that there is an undue risk that during the period of a suspended or probated sentence the defendant would commit another crime; two, the defendant is need of correctional treatment; and three, a lesser sentence than incarceration would deprecate the seriousness of this defendants's crime.

This court has also considered the provisions of Code of Criminal Procedure Article 894.1(B), and find the following grounds pertinent in setting the defendant's sentence: Number 5, the offender knowingly created a risk of death or great bodily harm to more than one person; number 9, the offense resulted in a significant economic loss to the victim. Approximately $1,175 was stolen from the business that was robbed with little or no hope of ever being repaid. The court finds that this was a significant amount of money for a small business and the victim in this crime. Number 10, the offender used a dangerous weapon in the commission of the offense; and Number 19, the offender used a firearm or other dangerous weapon while committing or attempting to commit an offense which has as an element the use, attempted use or threatened use of physical force against the person or property of another and which, by its very nature, involves a substantial risk that physical force may be used in the course of committing the offense.

At the hearing on Defendant's motion to reconsider sentence, Defense counsel stressed that, although he is a fifth felony offender, the offenses were relatively old, with his first felony committed approximately twenty years ago. Although defense counsel conceded that Defendant's record looked "terrible" with the number of arrests and convictions, he stated that they involved "relatively minor thefts." Defense counsel added that there were no crimes of violence or crimes against persons. With

12

regard to the instant offense, he asserted that no one was physically harmed other than being "scared to death." Lastly, Defense counsel argued that Defendant was a thief with a drug problem and that the instant offense was his first crime of violence.

Next, Defendant addressed the court, stating that he had a drug problem his entire adult life, and that it was never his intention to hurt anyone. He testified that he had stolen and shoplifted to support his habit. Defendant added that he never received any kind of help following his arrests, only jail time and probation. He did, however, state that he was placed in Blue Waters in New Orleans for thirty days. He testified that he "begged" his parole officer to give him ninety days of treatment, but that he was only given thirty days. Defendant then apologized to the victims for what he had done, reiterating that he never intended to physically hurt anyone. During his incarceration at Angola, Defendant stated that he was participating in an anger management class, was signed up for a drug class and was in "vo-tech." Defendant maintained that he was attempting to take steps to become a better person. In reconsidering Defendant's sentence, the trial court referred to the Defendant's ten-page Presentence Investigation Report which was considered at the original sentencing. The trial court noted that Defendant had a very unstable early childhood until he was placed into a suitable residence at the age of nine. Beginning in 1988, after he was dishonorably discharged from the United States Air Force, Defendant was arrested at least twenty-eight times. The trial court conceded that many of Defendant's arrests were related to his drug problem and were a means for supporting his drug problem. The court noted, however, that one of the goals of sentencing was to protect the public and that the instant offense appeared to be a first step taken by Defendant toward harming the public. As such, the trial court indicated that it was

concerned about the possibility of harm to the public. Additionally, because of Defendant's extensive record and the numerous past opportunities to better himself, the trial court denied Defendant's motion.

On appeal, Defendant stresses that he expressed remorse for the offense and was taking steps to become a better person. He also refers to his unstable early childhood, being abandoned by both parents and becoming a ward of the state. Defendant also asserts that he is not a violent offender and reiterates that his prior offenses, many of which he characterizes as old and minor, date back twenty years and include theft and possession of stolen things to support his drug habit. Considering the mitigating factors and the facts of this case, Defendant maintains that his sentence serves no useful purpose and that a shorter sentence with a focus on rehabilitation and treatment would meet societal goals.

Defendant did not refer to any jurisprudence to support his excessive sentence claim. A sentencing range of thirty-five to fifty years is considered acceptable by the supreme court for first-time offenders convicted of armed robbery. *State v. Smith*, 01-2574 (La. 1/14/03), 839 So.2d 1. Although Defendant is far from being a first felony offender, his sentence, nonetheless, falls within the appropriate range for first felony offenders. Considering Defendant's criminal history, his sentence in the instant case reflects leniency on behalf of the trial court after a thorough consideration of the mitigating and aggravating factors in this case. Accordingly, this assignment of error lacks merit and Defendant's sentence is affirmed.

**DEFENDANT'S CONVICTION AND SENTENCE ARE AFFIRMED.**

14